IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAY A. FOX, by and through his Guardian ROSE FOX, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 09 C 5453 |
| CONSTANTINE PETERS, TERRY MCCANN, FORMER WARDEN OF STATEVILLE CORRECTIONAL CENTER, WEXFORD HEALTH SOURCES, INC., IVETTA SANGSTER, LPN, DAVID BARNES, CMT, SEAN ROYCROFT, ROYCE BROWN-REED, OFFICER CURTIS, OFFICER M. BREWER, J. PASQUA, MARLON BROWN, J. ENCARNACION, MICHAEL R. BORKOWSKI, JOSEPH P. SHEEHY, KAREN FRYER, JAMES F. BECKER, UNKNOWN CORRECTIONAL OFFICERS, and UNKNOWN MEDICAL PERSONNEL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Ray A. Fox's Third Amended Complaint (Dkt. No. 109) alleges that defendants Dr. Constantine Peters, Terry McCann, Wexford Health Sources, Inc. ("Wexford"), Ivetta Sangster, David Barnes, Sean Roycroft, Royce Brown-Reed, Rosaline Curtis,[1] Michael Brewer, Marlon Brown, Julius Encarnacion, Michael Pasqua, Michael Borkowski, Karen Fryer, Joseph Sheehy, James F. Becker, unknown correctional officers, and unknown medical personnel violated his Eighth

---

[1] Subsequently in this opinion, Curtis will be referred to by her married name, Rosalina Rashad.

-1-

Amendment rights through deliberate indifference to his serious medical needs by failing to provide him the medication and medical attention he needed to avoid suffering an epileptic seizure. Before the court now are two motions for summary judgment. The first seeks summary judgment on behalf of Rashad, Fryer, Brown-Reed, Pasqua, Brown, McCann, Sheehy, Brewer, Borkowski, Barnes, and Encarnacion. Dkt. No. 184. The second seeks summary judgment on behalf of Wexford, Sangster, Roycroft, and Becker. Dkt. No. 188. Dr. Peters has not moved for summary judgment. For the following reasons, the court grants summary judgment as to McCann, Sangster, Brown-Reed, and Roycroft. Summary judgment is not appropriate, however, as to Barnes, Wexford, Becker, Rashad, Fryer, Pasqua, Brown, Sheehy, Brewer, Borkowski, and Encarnacion.

BACKGROUND

During the fall of 2007, Fox was an inmate at the Northern Reception Center of the Stateville Correctional Center ("NRC") in Joliet, a prison run by the Illinois Department of Corrections ("IDOC"). Dkt. No. 186 ("IDOC SOF") ¶ 1. Wexford at that time had contracted with IDOC to provide medical care for inmates at NRC. Dkt. No. 190 ("Wexford SOF") ¶ 2. Fox had suffered from seizures since approximately age 15. Dkt. No. 195-2 ("PSOF") ¶ 1. Prior to his arrival at the NRC, Fox had been taking Dilantin and Phenobarbital each day to treat his seizures. PSOF ¶ 4. When Fox arrived at Stateville on September 24, 2007, Dr. Constatine Peters examined him and prescribed 200 grams of Dilantin and 30 grams of Phenobarbital daily to treat his seizures. *Id.*

There were two ways that inmates received medicine at the NRC. *Id.* ¶ 12. Sometimes the inmate was permitted to keep the medicine in his cell and administer it himself (called "keep on person" or "maintenance" medications). *Id.* In that case, the corrective medical technicians (CMTs) delivered the medication. Otherwise, the nurses administered the medication one dose at a time

(called "watch take" medications). *Id.* In either case, the CMTs and nurses at the NRC kept Medication Administration Records ("MARs") that indicated when they gave medication to inmates. Wexford SOF ¶ 17.

The defendants have submitted Fox's MAR for Dilantin for September 2007. Dkt. No. 190, Ex. F. The MAR contains the prescription label which indicates that Fox was to take two 100 mg capsules of Dilantin daily from September 24, 2007 to October 24, 2007. *Id.*; *see also* Dkt. No. 190, Ex. E, at 157-68. David Barnes was the CMT assigned to deliver Barnes's Dilantin medication on September 25, 2007. According to Barnes, Fox's Dilantin was a maintenance medication that should have been delivered in a blister pack containing thirty tablets, or a fifteen-day supply, of Dilantin. Dkt. No. 190, Ex. E, at 168-70. Barnes initialed the MAR on September 25, which he testified indicated that he in fact gave Fox a blister pack containing thirty tablets of Dilantin on that day. *Id.* at 168. Barnes also testified that as a CMT, he distributed only maintenance medications, and that nurses would give out any watch take medications. *Id.* at 85-86.

Phenobarbital is a watch take medication. Wexford SOF ¶ 20. James Becker, a nurse at the NRC, initialed Fox's MAR for September 27, 29, and 30, and October 1-5. Nurse Sean Roycroft initialed Fox's MAR on September 26. Wexford SOF ¶22; PSOF ¶ 16. There are unidentified initials on the MAR for September 25 and 28, and October 6. Wexford SOF ¶¶ 21, 24, 25.

The inmates in the cells adjoining Fox's cell testified that from about October 2 until October 7, Fox repeatedly told passers-by that he did not have his medication and that he needed them to bring him his medication. PSOF ¶¶ 18-19. Although the inmates do not indicate which people specifically were passing by, CMTs Michael Borkowski, Karen Fryer, and Joseph Sheehy, and correctional officers Michael Brewer, Marlon Brown, Julius Encarnacion, Michael Pasqua, and

Rosalina Rashad all were on duty for at least one shift during the period October 2-7. *Id.* ¶¶ 112-16, 125-27. Moreover, each of the correctional officers was required to make rounds every 30 minutes during his or her shift, and each of the CMTs would have circulated through the prison while distributing medication, so they each in their routine procedure passed near Fox's cell. *Id.* ¶¶ 109, 118-19.

According to the inmates, the people who passed by Fox's cell responded by telling him, "We'll get to you later," "The next shift will handle it," "Let the med tech know when you see him going by," and the like. *Id.* ¶ 20. In addition, the inmates looked into Fox's cell on several occasions from October 2-7, and reported that food had piled up in Fox's cell, that they saw Fox in a curled up fetal position shaking, and that Fox looked sick. *Id.* ¶ 19. One inmate in an adjoining cell also testified that Fox complained to a correctional officer on the second shift a day or two before October 7 that Fox had been vomiting, had diarrhea, tremors, and the shakes, and that he needed to see a doctor and needed his medication. *Id.* ¶ 18.

On October 6, 2007, Barnes examined Fox in his cell after an unidentified correctional officer called for help after discovering that Fox vomited on his blanket and clothes. IDOC SOF ¶ 26; PSOF ¶ 123. At the examination, Fox informed Barnes that he had vomited once, had urinated on himself, and had a headache, sore throat, and chills. IDOC SOF ¶¶ 31-32. Fox also told Barnes that "I take Dilantin." *Id.* ¶ 28. Barnes took Fox's blood pressure, pulse, respiration, and temperature, all of which were normal. *Id.* ¶¶ 29-30. Moreover, Barnes noted that Fox was alert and "oriented times 3." *Id.* ¶ 30. Barnes determined that Fox was suffering from the flu and prescribed fluids, rest, and Tylenol. *Id.* ¶¶ 33-34. Barnes also referred Fox to the Health Care Unit

for an evaluation by a physician by placing him on sick call, a process that meant Fox would see a physician in two to three days. Dkt. No. 197 ("Pl.'s Resp. to IDOC SOF") ¶¶ 26, 34.

On October 7, Nurse Ivetta Sangster found Fox unresponsive in his cell when she arrived to deliver his Phenobarbital. PSOF ¶ 5. Prison officials transferred Fox to Provena St. Joseph Hospital, where he was diagnosed with inter-cranial hemorrhaging from a ruptured aneurysm. *Id.* ¶ 10. According to the reports of Fox's experts, the injury was the result of a seizure or seizures he suffered while at the NRC. *Id.* ¶ 5. Because of the injury, Fox has suffered permanent brain damage that limits his cognitive functioning and ability to lead a normal lifestyle. *Id.* ¶ 11.

## LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts before it in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## ANALYSIS

Fox has alleged that he is entitled to recovery against the various defendants under 42 U.S.C. § 1983 because the defendants violated his Eighth Amendment rights through deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Specifically, Fox contends that the defendants failed to administer his anti-seizure medications Dilantin and

Phenobarbital, and that they failed to respond to his repeated requests for medication and medical attention. To succeed on a deliberate indifference claim under the Eighth Amendment, a prisoner must show "(1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The defendants here do not dispute that Fox's epilepsy constituted a serious medical condition. *See Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998).

The only contested issue is whether the defendants were deliberately indifferent to that condition. "Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to the prisoner exists, but the defendant disregards that risk." *Id.* Moreover, deliberate indifference requires "intentional or reckless conduct, not mere negligence." *Id.* To be liable, "[t]he officials must know of and disregard an excessive risk to inmate health; indeed they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1984)).

Fox concedes that summary judgment in favor of Terry McCann, the warden of Stateville Correctional Center, is appropriate. Fox also concedes that summary judgment in favor of Royce Brown-Reed, Ivetta Sangster, and Sean Roycroft, nurses at the NRC, is appropriate. Dkt. 195-1 ("Pl.'s Mem. Opp. to Defs.' M. Summ. J."), at 3 n.1. Accordingly, the motions of those defendants for summary judgment are granted, and the claims against them are dismissed. The court will evaluate the remaining defendants in turn.

I.      David Barnes

Fox claims that Barnes was deliberately indifferent to Fox's serious medical needs first by failing to deliver Dilantin to him on September 25, and second by failing to ensure that he saw a doctor more quickly after Barnes evaluated him on October 6.

A.      Delivery of Fox's Dilantin Medication

As stated above, Fox's MAR indicated that Barnes delivered a blister pack of Dilantin to Fox on September 25. Dkt. No. 190, Ex. F. Fox asserts that several pieces of evidence cast doubt on the MAR and create a genuine dispute about whether Fox received the Dilantin. First, Fox contends that his blood level when he was taken to St. Joseph Hospital on October 7 showed that he had not received Dilantin for three to four days. For support, Fox cites to the report of his expert Dr. Arthur Taub. Dkt. No. 198, Ex. 18, at 15-16. Dr. Taub's report does not state explicitly that Fox's blood level indicated that he had not received Dilantin for three to four days. Instead, it posits two possibilities that are consistent with Fox's October 7 Dilantin levels. First, the report opines that Fox's levels were consistent with the ingestion of 200 mg/day of Dilantin each day from September 24 through October 7. *Id.* at 16. According to Dr. Taub, those levels were sub-therapeutic because they were inappropriately lower than Fox's prescription before he arrived at the NRC, which was for 300 mg/day of Dilantin. *Id.* Under that theory, the sub-therapeutic levels of Dilantin in Fox's blood were caused by a prescription that was too low, not by a failure to ingest Dilantin at all.

Alternatively, Dr. Taub opines that Fox's blood levels were also consistent with a scenario in which he took three tablets (of 100 mg each) of Dilantin each day, consistent with his previous dose, because he did not understand that the dosage had been lowered. *Id.* at 16-17. Under that scenario, Fox would have exhausted the 30 tablets of Dilantin in the blister pack after ten days, or

on October 4. *Id.* He then would have been without Dilantin between October 4 and October 7, which would have led to the blood levels observed at St. Joseph Hospital. *Id.* Under that scenario, too, Fox was a victim of a prescription that was too low, not of the medical staff's failure to deliver the drugs to him. Far from creating a genuine dispute, Fox's blood levels thus provide further evidence, even when viewed in Fox's favor, that Barnes provided Dilantin to Fox as stated in the MAR.

Second, Fox contends his repeated requests for medication from anyone who passed by in the days leading up to October 7 indicated that he did not have Dilantin in his possession. PSOF ¶ 18. That fact is not evidence that Fox did not receive Dilantin on September 25, however. Instead, it supports the second of Dr. Taub's scenarios, in which Fox would have prematurely exhausted his supply of Dilantin on about October 4. Indeed, if Fox had not received his Dilantin at all on September 25, one would reasonably expect him to have been asking for it long before October 2.

Third, Fox points out that Mary Purvin, the Director of Nursing at NRC, testified that if Fox had been given a blister pack of Dilantin, he would have signed a packing slip to show that he received it. PSOF ¶ 14. Fox contends that the absence of that packing slip from Fox's records creates a genuine dispute about whether he received the Dilantin. In addition, Purvin testified that if a doctor wanted to prescribe a maintenance medication, he would write "may have in cell" on the prescription, and there were no words to that effect on Fox's Dilantin prescription. *Id.* Barnes testified extensively about the process by which he delivered Dilantin, however, and he stated that he never required inmates to sign a packing slip. Dkt. No. 190, Ex. E, at 131:19-24, 184:1-4. There is thus no reason to expect to find a signed packing slip in Fox's medical records. Moreover, Barnes expected a doctor to write "watch take" on watch take medications, not "keep on person" on

maintenance medications. *Id.* at 103:14-23. Thus, the absence of a "keep on person" designation would not have prevented him from delivering the blister pack of Dilantin to Fox.

Viewing the evidence in Fox's favor, Purvin's testimony shows that Barnes was not following proper procedure when he delivered the Dilatin to Fox that Barnes says he delivered, but Purvin's testimony does not raise a material question of fact about whether Barnes delivered the Dilantin.[2] The court thus finds that there is no genuine factual dispute whether Barnes delivered thirty tablets of Dilantin to Fox on September 25, and Barnes was thus not deliberately indifferent for failing to deliver the Dilantin.

B. Barnes's October 6 Evaluation of Fox

After evaluating Fox on October 6, Barnes concluded that Fox had the flu and referred him to the Health Care Unit for an evaluation by a physician in two to three days. Dkt. No. 197 ("Pl.'s Resp. to IDOC SOF") ¶¶ 26, 34. Fox contends that because Barnes knew that Fox suffered from seizures and that his symptoms were consistent with an imminent seizure, Barnes should have sought more urgent medical attention for Fox. The court agrees that when viewing the evidence favorably to Fox, as the court must, a material dispute of fact exists on this point. Although "neither medical malpractice nor disagreement with . . . medical judgment amounts to deliberate

---

[2] Fox also notes that Sean Roycroft, one of the nurses at the NRC, testified that he was not aware of any medications given to inmates for many days at a time, and that he would have interpreted Fox's prescription for Dilantin to require him to give Fox Dilantin on a daily basis. Dkt. No. 196 ("Pl.'s Resp. to Wexford SOF") ¶ 19. That evidence merely indicates that Roycroft, as a nurse, was unfamiliar with the procedures by which CMTs handed out maintenance medications. It does not indicate that there were no maintenance medications or that Barnes did not hand out the Dilantin as a maintenance medication. Fox additionally notes that the inmates in the cells next to Fox never saw him receive medication. *Id.* That fact also does not cast doubt on Fox's receipt of the Dilantin, as the inmates may have been asleep or not paying attention when the Dilantin was delivered. Dkt. No. 210 ("Wexford's Resp. to PSOF") ¶ 18.

indifference," *Greeno*, 414 F.3d at 653, Fox's condition, based upon the symptoms Fox displayed when Barnes examined him, had sufficiently deteriorated by October 6 to create a genuine dispute of material fact of whether Barnes should have done more to treat Fox for seizures. Barnes knew that Fox suffered from seizures, because the MARs in Fox's file indicated that he was taking anti-seizure medication and because Barnes had delivered Dilantin to Fox. There is a material factual question why Barnes did not investigate further or refer Fox to a doctor for immediate attention since Fox's symptons may have indicated an imminent seizure.

Fox's specific comment to Barnes that Barnes quoted in his report, "I take Dilantin," when viewed favorably to Fox and when coupled with Fox's symptoms on October 6, should have caused Barnes to investigate or at a minimum inquire of Fox whether he needed Dilantin. The fact that Barnes at his deposition interpreted this quote to mean that Fox told him Fox took Dilantin, Dkt. No. 190, Ex. E, at 137:19-138:4, does not, at this stage of the litigation, allow the court to grant Barnes's motion for summary judgment. The jury at the trial will be allowed to assess Barnes's credibility. Although Barnes's interpretation is consistent with the plain meaning of the statement, "I take Dilantin," Barnes's failure to respond to Fox's comment about Dilatin could, when viewed in the light most favorable to Fox, be inferred to be an act of deliberate indifference. There is a sufficient material dispute of fact that a jury should decide whether Barnes's failure to take more immediate action to help Fox was the result of negligence or deliberate indifference to Fox's serious medical condition. Although Fox at trial will have the burden to establish that Barnes's treatment of Fox was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition, *Greeno*, 414 F.3d at 654, the court finds it appropriate, based on the records in this case,

to allow the jury to make the determination. The court must therefore deny Barnes's motion for summary judgment.

II.  CMTs Borkowski, Fyer, and Sheehy, and Correctional Officers Brewer, Brown, Encarnacion, Pasqua, and Rashad

Fox has also alleged that the CMTs and correctional officers who were on duty during the days before his seizure on October 7 were deliberately indifferent to his medical needs by failing to respond to his repeated requests for medication and for medical attention. The CMTs Borkowski, Fyer, and Sheehy, and the correctional officers Brewer, Brown, Encarnacion, Pasqua, and Rashad were each on duty for at least one shift during October 2-7, the period during which Fox was making his requests. PSOF ¶¶ 109, 112-16, 118-19, 125-27.

Fox contends that those facts are sufficient to support his claim that the CMTs and correctional officers were deliberately indifferent to his medical needs. In support, he cites *Thomas v. Sheahan*, 499 F. Supp. 2d 1062 (N.D. Ill. 2007) (Castillo, J.), a case in which the court held that there was a genuine dispute of material fact about whether officers who were on duty while the plaintiff repeatedly asked for medical attention and exhibited "obvious signs of serious illness," yet did nothing, were deliberately indifferent to the plaintiff's medical needs. *Id.* at 1092. Like here, the only evidence implicating the officers was that they had been working while the plaintiff was showing obvious distress.

The signs of serious illness in *Thomas* appear to have been more severe than Fox's symptoms until a day or two before Fox was carried away on October 7. In *Thomas*, the plaintiff was constantly vomiting, had been lying on the floor all week, was shaking, and was not moving much. *Id.* at 1082. The court in *Thomas* reasoned that those symptoms were so obvious that any official who walked by should have realized that the plaintiff had a serious medical need. *Id.* at 1092.

Fox, by contrast, did not display such obvious symptoms until a day or two before October 7. Before that point, his symptoms did not appear nearly as serious, particularly in the absence of his vomiting. Because there was no vomit, an official who happened to walk by when Fox was asleep, for example, would not have observed anything indicating a medical problem. Taking the evidence in the light most favorable to Fox, however, the officers and CMTs on duty on October 5-7 would have seen visible signs of Fox's medical distress. Those officers and CMTs included Pasqua, Brown, Encarnacion, Sheehy, Borkowski, and Fryer, who worked on the 5th, Brewer, who worked on the 6th, and Rashad, who worked on the morning of the 7th.[3] Summary judgment in favor of those defendants is thus denied.

III.   James Becker

According to the MARs, Becker was the Wexford nurse assigned to give Fox Phenobarbital on September 27, 29, and 30, and October 1-5. Dkt. No. 190, Ex. F. Becker thus was in a position to hear Fox's requests for medication and medical attention in the days leading up to October 7, and he would have observed Fox and interacted with him firsthand on those days. Viewing the evidence in the light most favorable to Fox, it is reasonable to infer that Becker was in a position to hear Fox's requests for medication and medical attention. Moreover, there is no evidence that Becker did anything to investigate the situation or to determine if Fox needed more medication. Consequently, summary judgment is inappropriate as to Becker.

IV.   Wexford Health Sources, Inc.

---

[3] There is also evidence that Rashad responded to Fox's requests for medication on the morning of the 7th by telling him "fuck you," which provides further evidence that summary judgment in favor of Rashad is inappropriate. PSOF ¶ 117.

Fox also contends that Wexford is liable because it maintained policies and procedures that led to Fox's inadequate medical care and the seizure he suffered on October 7. "[A] corporate entity violates an inmate's constitutional rights 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners.'" *Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (footnote omitted) (quoting *Estate of Novack ex rel. v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)). "This liability is not founded on a theory of vicarious liability or *respondeat superior* that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation." *Id.* (citation omitted). A plaintiff may establish corporate liability in two ways. First, he may demonstrate that a particular policy is itself unconstitutional. *Id.* Alternatively, corporate liability "can be demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level of [the entity] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Id.* (citation omitted).

The entirety of Wexford's argument in support of its summary judgment motion is as follows:

> Plaintiff's claim that Wexford maintained a policy where inmates with serious medical conditions were denied access to proper medical care, which resulted in frequent failures to provide proper medical care to inmates, also must fail for a lack of proof.
>
> Plaintiff cannot identify any Wexford policy or procedure which allegedly violated his constitutional rights. As plaintiff cannot identify a Wexford policy or procedure which actually violated his constitutional rights, this claim must also fail.

Dkt. No. 189, at 7. Those conclusory assertions are insufficient to shift the summary judgment burden to Fox. *See Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 460 (7th Cir. 2010) ("The moving party bears the initial burden of demonstrating that [the summary judgment] requirements have been met." (citation omitted)). Fox's argument is that Wexford had no written policy governing the distribution of medicine to inmates, PSOF ¶¶ 47-48, and that the lack of any such policy led to a series of failures to provide appropriate medical care to inmates. In light of that argument, it is disingenuous and frivolous to attempt to fault Fox for failing to identify a specific policy.

Wexford attempts to overcome that deficiency by raising the new argument in its reply that Fox cannot show a causal link between Wexford's policies and Fox's injuries. Dkt. No. 211, at 4-8. Although that argument may have merit, it is waived and the court will not consider it. *See Nelson v. LaCrosse Cty. Dist. Atty.*, 301 F.3d 820, 836 (7th Cir. 2002) (arguments raised for the first time in reply are waived). Accordingly, the motion for summary judgment as to Wexford is denied.

## CONCLUSION

For the reasons listed above, the motion of Rashad, Fryer, Brown-Reed, Pasqua, Brown, McCann, Sheehy, Brewer, Borkowski, Barnes, and Encarnacion for summary judgment (Dkt. No. 184) is granted with respect to McCann and Brown-Reed, and denied with respect to Barnes, Rashad, Fryer, Pasqua, Brown, Sheehy, Brewer, Borkowski, and Encarnacion. The motion of Wexford, Sangster, Roycroft, and Becker for summary judgment (Dkt. No. 188) is granted with respect to Sangster and Roycroft, and denied with respect to Wexford and Becker. Dr. Peters has not moved for summary judgment and remains a defendant. The parties' proposed pretrial order and

motions in limine are due on 1/12/12. The final pretrial conference is scheduled for 1/19/12 at 4 pm, and a jury trial will commence on 1/23/12. The parties are encouraged to discuss settlement.

ENTER:

                                              */s/ James F. Holderman*
                                              JAMES F. HOLDERMAN
                                              Chief Judge, United States District Court

Date: December 19, 2011